CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 26 2016

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SUSAN KALAN, <br> *as Administrator of the Estate of* <br> *June Mickey, deceased,* <br> <br> Plaintiff, <br> <br> v. <br> <br> HEALTH CENTER COMMISSION <br> OF ORANGE COUNTY, VIRGINIA, <br> a/k/a ORANGE COUNTY NURSING <br> HOME COMMISSION t/a DOGWOOD <br> VILLAGE OF ORANGE COUNTY <br> HEALTH AND REHABILITATION, <br> et al., <br> <br> Defendants. | Civil Action No. 3:16CV00023 <br> <br> **MEMORANDUM OPINION** <br> <br> By: Hon. Glen E. Conrad <br> Chief United States District Judge |

Plaintiff Susan Kalan, as administrator of the estate of June Mickey, filed this action against defendants Health Center Commission of Orange County, Virginia a/k/a Orange County Nursing Home Commission t/a Dogwood Village of Orange County Health and Rehabilitation ("Dogwood Village") and Orange County, Virginia (the "County"), as well as Randolph V. Merrick, M.D. and Randolph V. Merrick, M.D., P.C. (collectively, "Dr. Merrick"). Kalan brings claims under 42 U.S.C. § 1983 and state law. The case is presently before the court on Dogwood Village's motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the court will grant the motion.

### Factual Background

The following facts, taken from plaintiff's complaint, are accepted as true for purposes of the motion to dismiss. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Defendant Dogwood Village is a county-run health center facility in Orange County, Virginia. June Mickey was admitted to Dogwood Village on January 26, 2012. She required nursing home care due to several medical conditions, including "senile dementia, hypertension, atrial fibrillation, GERD, chronic pain due to osteoarthritis, failure to thrive, and a previous fall." Compl. ¶ 28. At the time of her admission, Dogwood Village's assessment form indicated that Mickey needed assistance with walking, used a wheelchair, and had a fall risk of "10." Id. ¶ 30. Defendant Dr. Merrick also signed an order that required Mickey to be transferred with the help of a Dogwood Village staff member, a gait belt, and a walker. The complaint alleges that, from January of 2012 until September of 2012, Mickey's movements were mostly independent— i.e., without assistance from staff or use of any equipment.

Mickey suffered no less than six separate falls while she resided at Dogwood Village. On October 11, 2012, Mickey fell out of her wheelchair in the presence of Dogwood Village staff. Her care plan was not revised to include additional precautions, and she continued to move without assistance. On November 19, 2012, Mickey fell in her room while trying to walk to the bathroom on her own. Dr. Merrick then ordered Dogwood Village staff to instruct Mickey as to "grippy" socks and being more cognizant of her surroundings. Id. ¶ 40. Mickey's fall assessment was not revised or updated.

On February 13, 2013, Dr. Merrick changed Mickey's transfer status from "assisted with one person, gait belt and a walker" to "independent." Id. ¶ 44. However, Mickey continued to receive assistance with her movements from February of 2013 to June of 2013. Her fall risk was subsequently increased to "16." Id. ¶ 45. By June of 2013, Mickey's care plan indicated that she required significant assistance with daily activities and had "generalized debility, impaired mobility, and occasional urinary and bowel incontinence." Id. ¶ 46.

2

On August 30, 2013, Mickey fell from her bed. In response, Dr. Merrick ordered Dogwood Village staff to provide Mickey with a defined perimeter mattress. Mickey's fall risk was also elevated to "18." Id. ¶ 48. On September 23, 2013, Mickey fell in her room, while she was returning from the bathroom. She attempted to lift herself up by holding onto her nightstand, but fell again. After this fall, Susan Kalan was advised by Dogwood Village staff that Mickey had received a defined perimeter mattress and anti-rollbacks on her wheelchair.

On November 30, 2013, Mickey fell while attempting to sit in her wheelchair without assistance. According to the complaint, the brakes on her wheelchair were not locked at the time. Dr. Merrick ordered Dogwood Village staff to place anti-rollbacks on Mickey's wheelchair, although Kalan was previously advised that this had already been done. Mickey's fall risk was upgraded to "19." Id. ¶ 52. Dr. Merrick's notes from January of 2014 and February of 2014 indicated that Mickey was independent with transfers. Furthermore, Mickey's use of a defined perimeter mattress was discontinued on February 15, 2014. However, the complaint claims that Dogwood Village's records dated March 5, 2014 indicated that Mickey did not walk on her own and required maximum assistance.

On March 19, 2014, a nursing aide at Dogwood Village found Mickey lying on the floor of her room. Mickey's left arm was hyper-extended under her and blood pooled around her head. At the time of her fall, Mickey's bed and wheelchair were not equipped with fall alarms that would have alerted Dogwood Village staff that she was moving. Mickey suffered a deep laceration above her left eyebrow, a small laceration on her left elbow, and swelling on her left mandible. She also complained of neck, shoulder, and hip pain.

Mickey was transported to Culpeper Regional Hospital and put under sedation. Hospital staff closed the laceration on Mickey's forehead with sutures. A CT scan revealed that Mickey

3

had "scattered subarachnoid blood in the frontal lobes and a fracture of the left posterior maxillary sinus, which perhaps extended to the lateral orbital wall." Id. ¶ 62. X-rays also revealed that Mickey had an "impacted distal radial facture of her left wrist[,]" a "comminuted left femoral neck fracture of her left hip," and "left pleural effusion." Id. Medical staff determined that Mickey required wrist and hip surgery. However, Mickey's condition deteriorated, and she was admitted to the intensive care unit. A second CT scan showed that Mickey had a collapsed left lung and "moderate right pleural effusion, possibly due to blood." Id. ¶ 64. On March 22, 2014, Mickey received a chest tube. She died four days later at the age of 88.

On March 15, 2016, Kalan filed this action against Dogwood Village, Dr. Merrick, and the County, alleging violations of 42 U.S.C. § 1983 and state law. Specifically, Kalan claims that Dogwood Village and the County deprived Mickey of her civil rights, as secured by federal and state laws and regulations, when they failed to prevent her injuries and subsequent death (Count I). Kalan also asserts a common law claim of negligence against all defendants (Count II). She seeks compensatory damages in the amount of $4,000,000.00, pre- and post-judgment interest, attorney's fees and costs, and any other appropriate relief. On April 29, 2016, Dogwood Village filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Upon a stipulation of dismissal by the parties, the court entered an order on May 13, 2016, dismissing both counts against the County and Count II against Dogwood Village. The court held a hearing on the motion to dismiss on July 1, 2016. The motion has been fully briefed and is now ripe for disposition.

## Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive

4

dismissal for failure to state a claim, a plaintiff must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, all well-pleaded allegations in the complaint are taken as true and all reasonable factual inferences are drawn in the plaintiff's favor. Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). However, "[a]t bottom, a plaintiff must 'nudge [her] claims across the line from conceivable to plausible' to resist dismissal." Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 364-65 (4th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The complaint must contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570. Although a complaint need not contain detailed factual allegations, it must contain more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." Id. at 555. In considering a Rule 12(b)(6) motion, the court may consider exhibits attached to or referred to in the complaint. See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999).

## Discussion

Dogwood Village moves to dismiss the complaint, arguing that Kalan has failed to state a plausible claim for relief under § 1983. When a federal statute does not explicitly provide for a private remedy, a plaintiff can enforce her rights under the statute through two avenues: (1) an implied right of action under the statute itself, or (2) a cause of action brought under § 1983. See generally City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 119-21 (2005). To state a cause of action under § 1983, a plaintiff must establish that she has been deprived of a right guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

5

"In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law." Blessing v. Freestone, 520 U.S. 329, 340 (1997) (emphasis in original). If there is no violation of a federal right, there is no basis for a claim under § 1983. Clark v. Link, 855 F.2d 156, 161 (4th Cir. 1988).

In the instant case, by failing to prevent Mickey's injuries and subsequent death, Kalan contends that Dogwood Village violated Mickey's civil rights as protected by the Medicaid Act, 42 U.S.C. § 1396-1396v; the Medicare Act, 42 U.S.C. § 1395; the Federal Nursing Home Reform Act ("FNHRA"), 42 U.S.C. § 1396r; federal regulations; and state regulations that govern the management and administration of nursing facilities.[1] The complaint sets forth fourteen specific violations of Mickey's civil rights under these laws.

In order to determine whether a particular statutory provision creates a federal right, the Supreme Court of the United States established a three-factor test: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) the plaintiff must demonstrate that the right purportedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) "the statute must unambiguously impose a binding obligation on the States." Blessing, 520 U.S. at 340-41. Even if all three factors are met, the Blessing test only creates a rebuttable presumption that the right is enforceable under § 1983. Id. at 341. Congress may explicitly foreclose enforcement under § 1983, or it may do so implicitly by creating "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Id.

Five years later, in Gonzaga University v. Doe, the Supreme Court clarified the confusion that had developed among district courts in interpreting Blessing. 536 U.S. 273, 283 (2002).

---

[1] Although Kalan contends that defendants violated the Medicaid Act, she only cites to provisions in the FNHRA, which is part of the Medicaid Act. As such, the court will limit its discussion to the FNHRA.

6

Specifically, the Court rejected the notion that "anything short of an unambiguously conferred right" could support a cause of action under § 1983. Id. Instead, the Court observed that, "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." Id. at 290. As a rule, "where the text and structure of a statute provide no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit." Id. at 286. Furthermore, the Court noted that its implied right of action cases should guide the analysis as to whether a statute confers rights enforceable under § 1983. Id. In other words, "'[t]he question whether Congress ... intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.'" Id. at 283-84 (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 576 (1979)). As such, "[a] court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context." Id. at 285.

The Supreme Court has only twice found that statutes passed pursuant to the Constitution's Spending Clause gave rise to enforceable rights, and one of those cases concerned a provision in the Medicaid Act. Gonzaga, 536 U.S. at 280-81. In Wilder v. Virginia Hospital Assn., the Supreme Court permitted health care providers to bring an § 1983 suit against state officials in order to enforce a reimbursement provision under § 1396a(a)(13)(A) of the Medicaid Act. 496 U.S. 498, 512 (1990). In so holding, the Court found that the provision did not create merely a procedural right that rates be accompanied by a finding of reasonableness and adequacy, but also that health care providers had "a substantive right to reasonable and adequate [reimbursement] rates." Id. at 510. Most importantly, the Court noted that "[t]he Medicaid Act

7

contains no comparable provision for private judicial or administrative enforcement." Id. at 521. Because the Medicaid Act provision at issue in Wilder is very different from the ones at issue in this case, the court must determine whether the provisions cited in the complaint meet the Blessing factors. See Doe v. Kidd, 501 F.3d 348, 355 (4th Cir. 2007) (determining, using the Blessing factors, whether the plaintiff had an enforceable federal right under § 1396a(a)(8) of the Medicaid Act).

As to the first Blessing factor, Dogwood Village contends that Congress did not enact any of the federal statutes cited in the complaint to confer federal rights upon nursing home residents. Congress' intent to benefit the plaintiff requires more than a showing that "the plaintiff falls within the general zone of interest that the statute is intended to protect...." Gonzaga, 536 U.S. at 283. Rather, "the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which [s]he belongs." Rancho Palos Verdes, 544 U.S. at 120. In other words, the plaintiff must show that the statute has an "unmistakable focus on the benefited class." Gonzaga, 536 U.S. at 284. "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." Alexander v. Sandoval, 532 U.S. 275, 289 (2001).

In this case, the court does not believe that Congress intended to confer federal rights to nursing home residents through the federal statutory and regulatory provisions cited in the complaint. The complaint includes several requirements under the Medicare Act and the FNHRA, which concern the quality of life for nursing home residents, services and activities provided to residents, nursing home administration, and compliance with other laws and professional standards. 42 U.S.C. §§ 1395i-3(b), (d); 42 U.S.C. §§ 1396r(b), (d). There is no doubt that nursing home residents are benefitted by these provisions, and that Mickey fell within

8

the general zone of interest in these provisions. However, § 1983 is meant to protect against deprivation of "rights, not the broader or vaguer 'benefits' or 'interests'...." Gonzaga, 536 U.S. at 283. "Post-Gonzaga, the statutory language must unambiguously indicate that Congress intended the statute to confer federal rights." Fiers v. La Crosse Cty., 132 F. Supp. 3d 1111, 1116 (W.D. Wis. 2015).

The court believes that the unmistakable focus of these statutory and regulatory provisions is on the conduct of the nursing home facilities. As an initial note, the "majority of courts that have considered whether the FNHRA and its regulations confer a private right of action have concluded that they do not." James v. Bd. of Curators of the Univ. of Mo., No. 4:09–CV–2066–RWS, 2011 WL 147910, at *3 (E.D. Mo. Jan. 18, 2011). The FNHRA was passed in order to "provide for the oversight and inspection of nursing homes that participate in Medicare and Medicaid programs." Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel, 570 F.3d 520, 523 (3d Cir. 2009). The majority of the requirements in the Medicare Act and the FNHRA are focused on what a skilled nursing facility must do in order to receive federal funding, rather than articulating any substantive rights held by the nursing home residents. See Anderson v. Dooley, No. 15-CV-05120-HSG, 2016 WL 3162167, at *3 (N.D. Cal. June 7, 2016) ("Rather than phrasing the subsections to focus on the nursing home residents who inevitably benefit from the FNHRA, Congress chose to focus on institutional polic[ies] and practice[s] necessary for Medicare and Medicaid administration." (internal quotation marks omitted)); see also Schwerdtfeger v. Alden Long Grove Rehab. & Health Care Ctr., No. 13 C 8316, 2014 WL 1884471, at *4 (N.D. Ill. May 12, 2014) (finding that Congress did not grant rights to nursing facility residents but "[i]nstead, Congress chose to impose obligations on ... nursing facilities requiring them to ensure that nursing facility residents receive certain benefits."). Even the

implementing regulations state that they "contain the requirements that an institution must meet in order to qualify as a [skilled nursing facility] in the Medicare program, and as a nursing facility in the Medicaid program" and "serve as the basis for participation in Medicare and Medicaid." 42 C.F.R. § 483.1(b). Finally, the quality of life provisions in the statutes "speak only in terms of institutional policy and practice," not individual care and services. Gonzaga, 536 U.S. at 288. As such, the court concludes that the unmistakable focus of these statutes and regulations is on the duties imposed on nursing home facilities who receive federal funding, rather on the benefitted class of nursing home residents.

Furthermore, the court believes that the language in the Medicare Act and the FNRHA, which refers to the nursing home residents, is distinguishable from the explicit rights-conferring language that courts have found to be critical to show congressional intent to create federal rights. In Gonzaga, the Supreme Court found that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 created individual rights because of their unmistakable focus on the benefitted class. 536 U.S. at 284 n.3 (noting that Title VI provides that "[n]o person in the United States shall…be subjected to discrimination under any program or activity receiving Federal financial assistance on the basis of race color, or national origin," and Title IX provides that "[n]o person in the United States shall, on the basis of sex,…be subjected to discrimination under any education program or activity receiving Federal financial assistance" (emphasis in original)). There is a significant difference between the language in Title VI and Title IX, which "directly applies to individual 'persons,' and the [FNHRA's] language which only applies to individual residents through the agreement of states to accept federal funds to create certain plans which will provide certain benefits to individual residents." Schwerdtfeger, 2014 WL 1884471, at *6. As the Supreme Court explained in Cannon v. University of Chicago,

10

> There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices.

441 U.S. 677, 690-93, 99 (1979). The court believes that the language in the Medicare Act and the FNHRA falls within the latter category described in Cannon, as both statutes require nursing home facilities to take proper care of residents in order to receive federal funds.

Similarly, in Doe v. Kidd, the United States Court of Appeals for the Fourth Circuit determined that § 1396a(a)(8) of the Medicaid Act created an enforceable right under § 1983. 501 F.3d at 356. That provision provided that "[a] state plan for medical assistance must … provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals…." 42 U.S.C. § 1396a(a)(8). The Court noted that the provision was expressly intended to benefit "all" individuals eligible for Medicaid assistance, which included the plaintiff, to reasonably prompt medical assistance. Doe, 501 F.3d at 356. This provision is distinguishable from those at issue in this case, which explicitly focus on the regulated entities. See Fiers, 132 F. Supp. 3d at 1116 (comparing § 1396a(a)(10), which has similar language to § 1396a(a)(8), to the provisions in the FNHRA and finding that they were distinguishable because the former "more directly conferred a federal right on Medicaid beneficiaries and focused on the recipient of the right—eligible individuals—rather than the regulated entities"). The court believes that the passing references to the nursing home residents in the statutes are insufficient to show Congress' clear and unambiguous intent to confer federal

11

rights to individuals like Mickey.[2]

Finally, to the extent that Kalan relies on federal regulations to show Congress' intent to create enforceable rights, the Supreme Court has explicitly held that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory test created, but it may not create a right that Congress has not." Alexander, 532 U.S. at 291. Finding that the federal statutes at issue do not create enforceable federal rights, the court also believes that the federal regulations do not invoke any enforceable rights. As such, the court concludes that the first Blessing factor, narrowed by the holding in Gonzaga, is not met in this case.

As to the second Blessing factor, the court considers whether Mickey's purported rights are so vague and amorphous that enforcement would strain judicial competence. As an initial note, Kalan argues that this factor is met because the federal statutes and regulations are written clearly enough for the court to apply their requirements to the facts in this case. She also notes that government agencies regularly interpret and apply these requirements when assessing whether nursing homes are in compliance. However, the proper question is whether the alleged rights are vague and amorphous, not simply the language in the underlying laws.

In the complaint, Kalan lists several "civil rights" held by Mickey that were violated by defendants, including her right to adequate supervision to prevent accidents, her right to receive care to attain or maintain her highest practicable well-being, her right to be free from hazards, her right to a comprehensive care plan, and her right to reside in an effectively and efficiently managed facility. Again, these provisions are concerned with imposing requirements on the

---

[2] The court acknowledges the contrary holding by the United States Court of Appeals for the Third Circuit in Grammer, on which Kalan relies. The court, however, joins a number of district courts in concluding that the reasoning in Grammer is contrary to the Supreme Court's holding in Gonzaga. See, e.g., Fiers, 132 F. Supp. 3d at 1119; Baum v. N. Dutchess Hosp., 764 F. Supp. 2d 410, 428 (N.D.N.Y. 2011); Hawkins v. Cty. of Bent, Colo., 800 F. Supp. 2d 1162, 1167 (D. Colo. 2011); Duncan v. Johnson-Mathers Health Care, Inc., No. 09-CV-417, 2010 WL 3000718, at *8-9 (E.D. Ky. Jul. 28, 2010).

12

nursing home facilities, rather than creating substantive rights for nursing home residents to the benefits within these requirements. Notably, the federal regulations contain a section that outlines the "rights of each resident," which must be protected and promoted by the nursing home facility. 42 C.F.R. § 483.10. These rights include: the right to manage his or her financial affairs, the right to choose a personal physician, the right to file grievances, the right to retain personal possession, and the right to meet with certain individuals. The court notes that "[t]he rights are clear, unambiguous, and easily subject to judicial enforcement." Fiers, 132 F. Supp. 3d at 1117. For example, it would be straightforward for a court to determine whether a nursing care facility was preventing a resident from having reasonable access to a telephone where calls can be made without being overheard, as required under § 483.10(k). However, Kalan does not allege that any of these explicit rights were violated by defendants. Instead, she refers to "generalized, vague, amorphous quality-of-life interests" that are insufficiently definite to be justicable. Id. Further, the Fourth Circuit in Doe found that this factor was satisfied because "reasonable promptness" was defined in the relevant federal and state regulations as forty-five or ninety days, depending on the applicant. 501 F.3d at 356. There is no such guidance for construing the alleged civil rights in this case. Accordingly, the court concludes that the second Blessing factor is not met.

Finally, the court believes, and Dogwood Village does not contest, that the third Blessing factor is met, as the statutes and regulations unambiguously impose a binding obligation on states and nursing home facilities who receive federal funds. However, as all three Blessing factors are not met, the court concludes that the federal statutes and regulations do not create any federal rights that are enforceable under § 1983.

13

Even if the court could find that the three Blessing factors are met in the instant case, the court also believes that the statutory enforcement scheme for these requirements supports its conclusion that the statutes and regulations fail to confer enforceable rights. Specifically, it appears that Congress intended that the Secretary of Health and Human Services (the "Secretary") and the states have primary authority to enforce the Medicare Act and the FNHRA, rather than individuals through causes of action either implicitly or under § 1983. The legislative history of the FNHRA confirms that in order to "improve the quality of care for Medicaid-eligible nursing home residents" the FNHRA would "either [] bring substandard facilities into compliance with Medicaid quality of care requirements or [] exclude them from the program." H.R. Rep. 100-391, pt. 1, at 452 (1987).

The state or the Secretary ensures compliance through a survey of the nursing home facility and a certification process. 42 U.S.C. § 1396r(g). Such process may be initiated upon receipt of a complaint from a nursing home resident. See 42 U.S.C. § 1396r(c)(1)(B)(iv) (requiring nursing home facilities to provide residents with a "statement that a resident may file a complaint with a State survey and certification agency respecting resident abuse and neglect and misappropriation of resident property in the facility"); 42 U.S.C. § 1395i-3(c)(1)(B) (same). If the state finds that a nursing home facility is not in compliance, the state may terminate the facility's participation in its federal funding plan or provide for specific remedies. Id. § 1396r(h)(1). Those specific remedies include denial of funding to the facility, assessment of a civil penalty, appointment of temporary management, or closure of the facility in emergency situations. Id. § 1396r(h)(2). The Secretary may also deny funding to the state if he or she finds a violation. Id. § 1396r(h)(3). Congress believed that "these sanctions will be invoked by both the Secretary and the States whenever necessary to promote compliance with the requirements of

14

participation and assure high quality care for nursing facility residents." H.R. Rep. No. 100-391, pt. 1, at 472. Although insufficient on its own to preclude enforcement under § 1983, residents also have the right to voice grievances to the nursing home facility with respect to their "treatment or care that is (or fails to be) furnished...." 42 U.S.C. § 1396r(c)(1)(A)(vi).

Furthermore, Congress specified that these enforcement provisions do not preclude an individual from pursuing an action under common law. 42 U.S.C. § 1396r(h)(8); see also H.R. Rep. No. 100-391, pt. 1, at 472 ("The Committee emphasizes that the remedies specified under the amendment are not exclusive, and should not be construed to limit the use of other remedies that may be available to either the States or the Secretary under State or Federal law. Nor should the specified remedies be construed to limit remedies available to residents at common law, including private rights of action to enforce compliance with requirements for nursing facilities."). As Congress specifically did not preclude individual actions under common law, the legislative history behind the FNHRA provides further support to the argument that Congress did not intend for residents to bring actions under § 1983. See Baum, 764 F. Supp. 2d at 424 ("Identifying that common law actions are not precluded by FNHRA is an indication that nursing home residents are not without any remedy—a point which would obviate the need to create another enforceable right.").

Finally, the court believes that this enforcement scheme is distinguishable from those found insufficient to preclude an action under § 1983. The availability of an internal grievance process, coupled with an option to file complaints directly with the state or the Secretary, is certainly more comprehensive than the remedy that was available to individuals who suspected a violation of § 1396a in Wilder. 496 U.S. at 523 (finding that the Virginia did not allow health care providers to challenge the overall method by which their reimbursement rates were

15

determined). The specific allegations in this case—i.e., negligence by the defendants—are explicitly within the scope of complaints that residents have a right to bring to the attention of the state, the Secretary, or the nursing home facility. See, e.g., 42 U.S.C. § 1396r(c)(1)(B)(iv) ("[A] resident may file a complaint with a State survey and certification agency respecting resident abuse and neglect and misappropriation of resident property in the facility."). This enforcement scheme is also unlike the one at issue in Wright v. City of Roanoke Redevelopment and Housing Authority, which did not provide individuals with any procedure to bring violations to the attention of the Department of Housing and Urban Development ("HUD"), and solely relied on HUD's general authority to audit, enforce compliance, and cut off federal funds. 479 U.S. 418, 428 (1987). Here, each state is required to maintain procedures and adequate staff to investigate violations of the statutory requirements by nursing home facilities. 42 U.S.C. § 1395i-3(g). The court believes that "[t]hese administrative procedures squarely distinguish this case from Wright and Wilder, where an aggrieved individual lacked any federal review mechanism." Gonzaga, 536 U.S. at 289-90. If individual nursing home residents could instead enforce compliance through a § 1983 action, that course of action would undermine the statutory enforcement scheme and the legislative history behind the FNHRA. The court believes that such a comprehensive enforcement scheme supports its determination that Congress did not intend to create individually enforceable federal rights. See Hawkins, 800 F. Supp. 2d at 1169 ("Because residents have other avenues of redress, there was no need for Congress to create an enforceable right.").

Overall, the court concludes that the statutory and regulatory provisions in the complaint do not confer federal rights to nursing home residents like Mickey and, thus, cannot support a cause of action under § 1983. As Kalan has not stated a plausible claim under § 1983, the court

16

will grant Dogwood Village's motion to dismiss Count I of the complaint.

The court also declines to exercise supplemental jurisdiction over Kalan's remaining negligence claim against Dr. Merrick under Count II. See 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction). As Kalan noted in her opposition brief, Virginia has implemented its own regulatory scheme in order to ensure adequate care at nursing home facilities. See 22 Va. Admin. Code 5-371-110 et seq. In the interest of comity, the court will not interject itself into an area that is governed by several state regulations. Payman v. Lee Cty. Cmty. Hosp., 338 F. Supp. 2d 679, 683 (W.D. Va. 2004) (Jones, J.) ("Comity advises against a federal court exercising jurisdiction over a matter more appropriately decided in state court."). Accordingly, the court will also grant the motion to dismiss with respect to Count II.

## Conclusion

For the foregoing reasons, the motion to dismiss will be granted. Count I will be dismissed, as the court believes that Kalan has failed to state a plausible claim for relief under § 1983. As to Count II, the court declines to exercise supplemental jurisdiction over Kalan's negligence claim, and that count will also be dismissed. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 26th day of July, 2016.

_____
Chief United States District Judge